NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 06a0416n.06
Filed: June 20, 2006

No. 05-5771

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

KELLIE D. CAMPBELL,　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　)
　　　　　Plaintiff-Appellant,　　　　　)　　　ON APPEAL FROM THE
　　　　　　　　　　　　　　　　　　　　)　　　UNITED STATES DISTRICT
　　　　　v.　　　　　　　　　　　　　　)　　　COURT FOR THE MIDDLE
　　　　　　　　　　　　　　　　　　　　)　　　DISTRICT OF TENNESSEE
　　　　　　　　　　　　　　　　　　　　)
ECKERD CORPORATION,　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　)
　　　　　Defendant-Appellee.　　　　　)
_____

BEFORE: BATCHELDER and GRIFFIN, Circuit Judges, and ZATKOFF, District Judge.[*]

PER CURIAM.

Plaintiff Kellie Campbell appeals the district court's grant of summary judgment to defendant

Eckerd Corporation ("Eckerd") pursuant to Federal Rule of Civil Procedure 56. Campbell, a former

Eckerd employee, brought suit against Eckerd alleging violations of the Americans with Disabilities

Act ("ADA"), the Tennessee Handicap Act ("THA"), and the Family and Medical Leave Act

("FMLA") following her termination from Eckerd's employ. Plaintiff now urges this Court to

reverse the district court's determination that she (1) failed to establish a prima facie case of

discrimination pursuant to the ADA, and (2) did not demonstrate that Eckerd's purported reason for

---

[*]The Honorable Lawrence P. Zatkoff, United States District Judge for the Eastern District
of Michigan, sitting by designation.

terminating her was pretextual, thus invalidating her case pursuant to the FMLA. We disagree and affirm.

I.

Plaintiff Kellie Campbell was an employee of defendant Eckerd from November 14, 2001, until her termination on August 26, 2003. Campbell was initially hired as a photo lab manager for its West End store in Nashville (the "West End store"). In May 2003, Campbell was transferred to the Shelbyville, Tennessee store, which Campbell considered a promotion, because the Shelbyville store had the highest volume photo lab in Tennessee. Her immediate supervisor at the Shelbyville location was Mark Briggs, the "front-end" photo supervisor who oversaw every photo lab manager and store manager in his regional market.

On June 10, 2003, Campbell took paid vacation leave in order to undergo an exploratory surgery relating to bladder problems. Campbell was thereafter diagnosed with interstitial cystitis, a condition wherein the bladder lacks a normal protective biochemical membrane that protects the deeper muscle and nerve fibers in the bladder from urine irritants. Dr. Whitfield, Campbell's urologist, testified that people with interstitial cystitis often experience inflammation and bladder pain due to the presence of urine in the bladder, which has a tendency to lead to urinary tract infection-type syndrome.[1] After this surgery, Campbell received a series of injections beginning on

---

[1]According to plaintiff, Dr. Whitfield's deposition was mistakenly not included in the trial court record or joint appendix. This sentence was derived from the district court's opinion. This undisputed fact appears not to be at issue.

July 2, 2003, her last day of work prior to commencing a medical leave of absence pursuant to the FMLA.

That same day, Campbell left the Shelbyville store to go to the West End Eckerd store. According to Campbell, the primary purpose of going to the West End store was to pick up a roll of film that had been processed at West End but was for a Shelbyville customer.[2]  The secondary purpose of the trip was to deliver six rolls of film that Campbell had developed for a West End customer.  These six rolls of film belonged to Shirley McGee, a West End Store customer who Campbell used to assist when she worked at the West End store.  According to Campbell, McGee specifically requested that Campbell develop her film.  Campbell agreed to develop the film at the Shelbyville location and took McGee's telephone number so that Campbell could call her when the pictures were available back at the West End location.

Campbell acknowledged that it is store policy to fill out an "inter-store transfer form" when photos are processed at one lab and taken to another.  According to Campbell, the Shelbyville store was out of these forms, and, as a result, she did not fill one out upon leaving the store.  Instead, Campbell spoke with Melissa Davie, the manager of the West End store, to see if that store had any inter-store transfer forms.  Davie verified that the store did, and Campbell stated that she would need one when she arrived.

---

[2]If the photo processing machine at the Shelbyville location malfunctioned, Campbell would take the pictures into the West End location for developing.

As Campbell was leaving the Shelbyville store, Lisa Rust, the assistant manager of the Shelbyville store, performed a "bag check" on Campbell. According to Rust, a "bag check" is the process by which store managers and assistant managers can check bags of employees who are leaving the store to make sure that they have a receipt for the items which they are taking out the door. Rust testified that she performed the "bag check" on Campbell because Terri, another Shelbyville photo lab employee, had called the front to inform her that Campbell had developed nine rolls of film, in triple prints, and was going out of the store with them because they were for a West End customer. After this call, Rust went outside, stopped Campbell at her car in the parking lot, and verified the number of envelopes of developed film in the bag. Although Rust maintains that Campbell was carrying nine envelopes, or nine rolls, of developed film, Campbell contends that Rust was mistaken and that she was carrying only seven envelopes, one of which was hers and had mistakenly been placed in the bag with the other six envelopes belonging to McGee. Campbell acknowledged that it was Eckerd "policy that we can't take [any]thing out of the store unless we show the receipt." She further acknowledged that she did not have a receipt for any of the developed photos in the bag, including her own, when she left the Shelbyville store, nor did she have an inter-store transfer form.

After Campbell left the Shelbyville store, Rust called Briggs and advised him of the situation. Rust further testified that she called Karen Carmichael at the West End store and informed her that Campbell was on her way with nine rolls of developed film, eight of which were triple prints, for a West End customer. In addition, Rust called the Tennessee district manager, Wayne

Bush, and apprised him of the situation. Bush testified that he advised Rust to speak with Briggs and take statements regarding the situation.

During her drive from Shelbyville to Nashville, Campbell made several cell phone calls. First, Campbell called Briggs and told him she was taking photographs to the West End store for one of its customers. Briggs inquired whether Campbell had an inter-store transfer form, and Campbell replied that she did not. According to Campbell, Briggs told her that it was fine, but to fill the form out when she arrived at the West End store and make sure that a copy got back to the Shelbyville store. Briggs testified that he, in turn, also called Karen Carmichael at the West End store and advised her that Campbell was on the way and requested that Carmichael verify the number of photos Campbell was delivering. Campbell also called McGee to inform her that her pictures were ready and she would be at the West End store in approximately thirty to forty-five minutes. McGee stated that she was in a hurry to get to a doctor's appointment, and requested that Campbell meet her with the pictures at a gas station. Campbell agreed.

Campbell arrived in Nashville earlier than she anticipated, and first went to the West End location for twenty to thirty minutes. Campbell then drove to the gas station to meet with McGee and deliver the photos. McGee proceeded to look through the photographs for twelve to fifteen minutes and subsequently decided that she did not want twenty to twenty-five of the photos. Eckerd's policy is to buy back photos that the customer did not want to purchase, and, pursuant to this policy, Campbell testified that she recalculated the amount actually owed by McGee. McGee

gave her a credit card number and expiration date in order to pay for the appropriate number of pictures.

Campbell then returned to the West End store for the stated purpose of making payment for the photographs she had delivered to McGee at the gas station. Campbell spoke with Melissa Davie, the West End store manager about the transaction, and, according to Campbell, she determined with Davie that an inter-store transfer form was not needed, as Campbell should just ring the transaction up back at the Shelbyville store. According to Davie, however, when Campbell returned, she attempted to ring up the sale with $14 in cash, stating that McGee had given her the $14 to pay for the photos. Davie also testified that there was a "huge discrepancy" between the amount calculated by Campbell and the amount McGee actually owed for the photographs. Although Campbell acknowledges that she "messed up" the calculations, she asserts that it was a $12 to $13 difference, and that she never presented $14 in cash.

After Campbell left the West End store to return to Shelbyville, Mark Briggs got a call from Davie and Carmichael at the West End location reporting the "strange circumstance" of Campbell's payment. Briggs called the Shelbyville store and requested that they verify that Campbell brought the returned photos back to the store. Campbell returned to the Shelbyville store, rang up the charges for six envelopes with the credit card, paid for her own photos with her debit card, and showed Rust the receipts. Rust called Briggs back to inform him that all the pictures had been purchased for a total of $90. Campbell finished the workday without any further comment from anyone at Eckerd.

- 6 -

Thereafter, Briggs proceeded to get written statements from everyone involved in the incident, and written statements from Rust, Davie, and Carmichael were prepared and sent to his office that same day. Briggs stated that he reviewed the statements that evening and forwarded them to Ron Seitler, the human resources manager. Seitler believes he received the statements the following day, July 3, 2003.

Campbell began her FMLA leave on July 3, 2003, pursuant to approval by the Eckerd leave of absence department. According to Seitler, because Campbell was on medical leave, Eckerd could not take any further action with respect to the July 2, 2003, incident until she returned. Her leave ended on August 22, 2003. During her leave of absence, Campbell testified that she spoke with Briggs nearly every week to keep him updated on her status. According to Campbell, Briggs would ask her if "you're going to be able to come back at 100% for me" because the Shelbyville store was a high-volume store. Campbell would respond that returning to work at one-hundred percent was her plan, but that "everybody is different." Further, she stated that she told Briggs, Bush, and the leave department that her disease was incurable but could be put into remission. Briggs only remembers speaking with Campbell once while she was on leave.

On August 22, 2003, Campbell was released to work full-time with no restrictions, save for a restriction on lifting heavy objects, which admittedly was not a problem, and the necessary bathroom breaks. On August 25, 2003, Campbell reported to Eckerd's district office, where she met with Briggs and Bush and was asked about the July 2, 2003 incident. Campbell submitted her version of the events in a handwritten statement. Briggs faxed the statement to Seitler for review,

and, later that same day, Seitler directed that Campbell be suspended based on company violation and ultimately terminated.

On September 2, 2003, Campbell filed a charge with the Tennessee Human Rights Commission, alleging that she was terminated because Eckerd regarded her as disabled.[3]   On December 2, 2003, Campbell filed a complaint in district court alleging that Eckerd fired her for exercising her rights under the FMLA, and because of her real or perceived disability in violation of the ADA and the THA.  On May 3, 2005, the district court granted summary judgment for Eckerd.

Plaintiff timely appealed the dismissal of her complaint.

II.

This Court reviews de novo a district court's grant of summary judgment. *Terry Barr Sales Agency, Inc. v. All-Lock Co. Inc.*, 96 F.3d 174, 178 (6th Cir. 1996).  Summary judgment is appropriate only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c).  Upon the filing of a motion for summary judgment, the opposing party must come forth with sufficient evidence to withstand a motion for a directed verdict. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 247-52, (1986).  The district court judge does not "weigh the evidence and determine the truth of

---

[3]As the district court noted, Campbell does not contend that Eckerd fired her because of an actual disability, but because Eckerd perceived her as disabled.  She admitted that "nobody considered me disabled, not the doctors, not me, not anybody."

the matter but [instead] determine[s] whether there is a genuine issue for trial." *Liberty Lobby*, 477 U.S. at 249. For such a motion, the district court views the evidence and draws all reasonable inferences in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Nevertheless, a mere scintilla of evidence is insufficient; "there must be evidence on which the jury could reasonably find for the [non-movant]." *Liberty Lobby*, 477 U.S. at 252. Entry of summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The nonmoving party has an affirmative duty to highlight the specific portions of the record upon which it relies to allege a genuine issue of material fact. *Accord In re Morris*, 260 F.3d 654, 665 (6th Cir. 2001).

Campbell has essentially reiterated the arguments she proffered in district court. She specifically contends that this Court should find error in the district court's proceedings because: (1) she raised a genuine issue of fact as to whether Eckerd perceived her as disabled; and (2) she raised a genuine issue of fact with regard to pretext in her FMLA claim. We disagree.

For the reasons stated by the district court's opinion, which we hereby adopt as our own, Campbell neither established a genuine issue of fact as to whether Eckerd perceived her as disabled, nor sufficiently rebutted Eckerd's legitimate, nondiscriminatory reason for terminating Campbell.

Affirmed.